IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

S.S., *et al.*,                                              *

      Plaintiffs,                                   Civil Action No. RDB-19-03168

                                              *

v.                                                          *

Board of Education of Harford County,
*et al.*,                                                   *

      Defendants.                                   *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

Plaintiff S.S., a minor, and her parents (the "Parents") brought this action against the Board of Education of Harford County ("HCPS") and Superintendent of Harford County, Dr. Sean Bulson (the "Defendants") as aggrieved parties from an adverse decision issued by an Administrative Law Judge ("ALJ") pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* ("IDEA"), and Md. Code Ann., Educ. § 8-401 *et seq.* Plaintiffs also allege violations of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12131, *et seq.* ("ADA"). (*See* Compl. 2, ECF No. 2.) S.S. is a student with an Autism Spectrum Disorder with accompanying intellectual and language impairments, comorbid Attention Deficit Hyperactivity Disorder, Development Coordination Disorder, Unspecified Anxiety Disorder, and congenital heart disease. (*Id.* at 4.) On January 25, 2019, the Parents filed a Due Process Complaint with the Maryland Office of Administrative Hearings ("OAH") requesting a hearing to review the identification, evaluation, or placement of S.S. by the

Defendants under the IDEA.  The ALJ issued a decision on June 7, 2019, finding that HCPS did not violate the IDEA (Hr'g Decision at 102), and on October 31, 2019, the Parents removed this matter to this Court with the filing of a Complaint.  (ECF No. 2).  Pending now before this Court is the Plaintiffs' Motion for Summary Judgment (ECF No. 33) and Defendants' Cross Motion for Summary Judgment (ECF No. 36).  The parties' submissions and the administrative record have been reviewed and no hearing is necessary.  *See* Local Rule 105.6 (D. Md. 2018).  S.S. was denied a free appropriate public education for the 2017-2018 and 2018-2019 school years.  Her parents may collect the cost of her placement in a private school for those years and shall be reimbursed for the continued cost of such placement as necessary.  For the reasons that follow, the Plaintiffs' Motion for Summary Judgment (ECF No. 33) is GRANTED as to Count 1 and DENIED as to Counts 2 and 3. The Defendants' Cross Motion for Summary Judgment (ECF No. 36) is DENIED as to Count 1 and GRANTED as to Counts 2 and 3.

## BACKGROUND

### I.    The Individuals with Disabilities Education Act ("IDEA")

This Court begins with a brief overview of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education ("FAPE") that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A); *Fry v. Napoleon Cmty. Schs.*, 137 S. Ct. 743, 748 (2017).  In exchange for receiving federal funds under the Act, states pledge to comply with a number of statutory

conditions.

First, a school district must prepare and implement an appropriate Individualized Education Program ("IEP") for each child determined to be learning disabled. 20 U.S.C. § 1414(d). The United States Supreme Court addressed the standard for determining whether a school has provided an appropriate IEP in *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988 (2017). "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 999. Creating an IEP is a "fact-intensive exercise," "informed not only by the expertise of school officials, but also by the input of the child's parents or guardians." *Id.* "Any review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Id.* The IEP itself "addresses the student's current educational status, annual educational goals, the need for special educational services or other aids necessary to help meet those goals, and whether the child may be educated in regular school classroom with non-disabled students." *M.L. v. Smith*, No. PX-16-3236, 2018 WL 3756722, at *1 (D. Md. 2018) (citations omitted).

Additionally, a student's FAPE must provide a disabled child with meaningful access to the educational process. *Bd. of Educ. of the Henrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 192 (1982) ("[I]n seeking to provide . . . access to public education, Congress did not impose upon the States any greater substantive educational standard than would be necessary to make such access meaningful."). The Supreme Court in *Rowley* determined that a school provides a student with FAPE when the IEP provides access to an educational

program that confers "some educational benefit" upon the student with a disability.  *Rowley,* 359 U.S. at 200.  To determine whether this standard is met, this Court follows a two-step inquiry.  *Id.* at 206.  First, this Court must determine whether the state or local educational authority complied with the procedures set forth in the Act.  *Id.*  Second, this Court must determine whether the IEP was reasonably calculated to enable the child to receive educational benefits.  *Id.* at 207.  As the party challenging the administrative findings, the Plaintiffs bear the burden of proof of establishing a violation of the IDEA. *See Barnett v. Fairfax Cnty. Sch. Bd.,* 927 F.2d 146, 152 (4th Cir. 1991), *cert. denied,* 502 U.S. 859 (1991); *Cavanagh v. Grasmick,* 75 F. Supp. 2d 446, 457 (D. Md. 1999).

In addition to providing this "basic floor of opportunity," *Rowley*, 359 U.S. at 201, the IEP must place the child in the least restrictive environment ("LRE"), meaning that students with and without disabilities should be educated in the same classroom "to the maximum extent appropriate," 20 U.S.C. § 1412(a)(5)(A).  In some cases, however, a general education environment may not be an appropriate placement for a child due to the nature or severity of her disability.  34 C.F.R. § 300.114(a)(2)(ii).  In such a case, it is well-established that a FAPE might require placement of the child in a private school with full funding by the public-school district.  *Sch. Comm. of Burlington v. Dep't of Educ.,* 471 U.S. 359, 369 (1985).  However, the school district is not required to pay for the student's tuition at private school if it has satisfied its obligation to provide a FAPE for the student. 34 C.F.R. § 300.148(c).  Parents may recover the cost of private education only if a court finds both (1) the proposed IEP inadequate in its provision of a FAPE, and (2) the private education services obtained by the parents are appropriate to meet the child's needs. *Florence Cnty. Sch. Dist. Four v. Carter,*

510 U.S. 7, 15 (1993) (citing *Burlington,* 471 U.S. at 374).

Additionally, in the face of IDEA violations, courts may "grant such relief as [they] determine is appropriate," 20 U.S.C. § 1415(e)(2). However, in *Hall by Hall v. Vance Ctny. Bd. of Educ.*, 774 F.2d 629 (4th Cir. 1985), the U.S. Court of Appeals for the Fourth Circuit held that not all forms of relief are appropriate. "While the Act permitted reimbursement, it did 'not create a private cause of action for damages for educational malpractice.'" *Sellers by Sellers v. Sch. Bd. of City of Mannassas, Va.*, 141 F.3d 524, 526 (4th Cir. 1998) (quoting *Vance*, 774 F.3d at 633 n.3). "Tort-like damages are simply inconsistent with the IDEA's statutory scheme." *Id.* at 527. However, the Fourth Circuit and this Court have held that when a FAPE is not provided to a disabled student, the student's parents may seek an award of "compensatory education." *Y.B. v. Bd. of Educ. of Prince George's Cnty.*, 895 F. Supp. 2d 689, 693 (D. Md. 2012) (citing *G. ex rel. R.G. v. Fort Bragg Dependent Schs.*, 324 F.3d 240, 253-54 (4th Cir. 2003). Such "educational services are 'ordered by the court to be provided prospectively to compensate for a past deficient program,' i.e., the school's failure to provide the student with a FAPE." *Id.* at 693-94.

## II.   Background

S.S. was born in July 2012 and was diagnosed in 2014 with an Autism Spectrum Disorder with accompanying intellectual and language impairments, and comorbid Attention Deficit Hyperactivity Disorder, Development Coordination Disorder, Unspecified Anxiety Disorder, and congenital heart disease. (Compl. 4, ECF No. 2.) S.S.'s disabilities impact her receptive, expressive, and pragmatic language skills, and her functional communication. (*Id.*) She has also demonstrated atypical sensory processing, limited eye contact and attention, as

5

well as delays in fine motor, feeding, physical, gross motor, and adaptive learning skills.  (*Id.*)

On or about May 19, 2015, an IEP team met to determine whether S.S. was eligible to begin special education services under an IEP.  (Hr'g Decision at 10.)  At this meeting, the team decided that S.S. would continue early intervention services at HCPS under an individualized family service plan as a child with developmental delays.  (*Id.*)  On September 28, 2016, an IEP team again met and adopted an IEP for S.S. to attend the early learners class at Homestead-Wakefield Elementary School for four one-half days per week.  (*Id.*)  The IEP placed S.S. in a special education classroom and provided for twenty-four hours per month of special education services and one hour per month of occupational therapy.  (*Id.* at 11.)  S.S.'s IEP contained seven goals and twenty-seven objectives in the areas of Social Foundations, Language and Literacy, Mathematics, and Physical Well-Being and Motor Development.  (*Id.* at 11.)  At this time, S.S.'s IEP did not contain any behavioral goals nor note any significant behavioral problems that interfered with her access to the learning environment.  (*Id.*)  The IEP also provided for extended school year (ESY) services for six weeks beginning on June 26, 2017, and ending on August 11, 2017.  (*Id.* at 11.)  The Parents approved this IEP.  *(Id.)*

On April 7, 2017, an IEP team meeting was held to discuss S.S.'s progress.  (*Id.*)  At this point, it appeared that S.S. was demonstrating behavior that was interfering with her ability to achieve satisfactory growth and progress on her IEP goals and objectives.  (*Id.*)  The problematic behaviors included chronic noncompliance and throwing objects in the classroom.  (*Id.*)  Mrs. S. also reported at this meeting that S.S. had engaged in self-hitting at home.  (*Id.*)  Given this information, the IEP team agreed that conducting a Functional

Behavior Assessment ("FBA") would be appropriate in order to create and implement a Behavioral Intervention Plan ("BIP"). (*Id.*) A BIP is a "proactive, data-based, structured plan that is developed as a result of a functional behavioral assessment which is consistently applied by trained staff to reduce or eliminate a student's challenging behaviors and to support the development of appropriate behaviors and responses." Md. Code Regs. 13A.08.04.02B(1). An FBA is "the systematic process of gathering information to guide the development of an effective and efficient behavior interventional plan for the problem behavior." Md. Code Regs. 13A.08.04.02B(5).

Around this time, an incident occurred at Homestead-Wakefield where S.S. was found in the parking lot of the school after eloping from her classroom. (Compl. 5, ECF No. 2.) School staff reportedly had been dealing with another child and were unaware that S.S. was missing until she was returned to the school by the parent of another child, who happened to be visiting the school. (*Id.*)

In May 2017, a Central IEP team meeting was held in order to discuss S.S.'s placement for kindergarten. (*Id.*) At this time, it appears the IEP team was aware of the problematic behaviors that were observed in the 2016-2017 school year. (*Id.*) The IEP team had data related to S.S.'s self-hitting, throwing behaviors, and noncompliance, and it was noted that a Behavioral Intervention Plan ("BIP") would be added to her IEP. (*Id.*) The data provided indicated that S.S. exhibited self-hitting three to ten times per day for five to twenty-five seconds, throwing behaviors occurred one to fifteen times per day and were "ongoing," and the noncompliance was "constant" when not receiving intensive instruction. (*Id.*) At this meeting, the Central IEP team determined that S.S.'s IEP should be amended to

7

include an increase in services to reflect five full days per week of services for kindergarten, and that S.S. required a more intensive, small structured learning environment across all content areas, which was not available at a comprehensive school.  (Compl. 7, ECF No. 2.) They determined that S.S. would be placed in the STRIVE program at the John Archer School, an HCPS public separate day school.  (*Id.*)  However, at this time it does not appear that S.S.'s IEP was actually amended to reflect the change in service hours or placement. (*Id.*)

Following this meeting, the Parents enlisted the assistance of an educational consultant, Annie McLaughlin, Ph.D., a Doctoral-level Board Certified Behavior Analyst ("BCBA") and Licensed Behavioral Analyst.  (*Id.* at 6.)  On June 1, 2017, Dr. McLaughlin observed S.S. at Homestead-Wakefield.  (Hr'g Decision at 11.)  Dr. McLaughlin observed S.S. in the play area engaged in unstructured activity as well as an instructional lesson.  (*Id.* at 11-12.)  Dr. McLaughlin testified that she believed S.S.'s teacher was using an ineffective method of instruction, and that S.S. was non-responsive to the teacher's attempts to engage her.  (*Id.* at 12.)  She was told by the teacher that this was a "typical" day for S.S.  (*Id.*)

Despite the noted and problematic behavioral issues that emerged during this 2016-2017 school year, the ALJ found that S.S. achieved two of the seven goals on her IEP, one each in the areas of Social Foundation and Mathematics, as well as twenty of her twenty-seven objectives.  (*Id.*)  However, HCPS's own 2017 IEP Progress Report documented that S.S. was "not making sufficient progress" on four of her seven IEP goals.  (Compl. 6, ECF No. 2.)   By the end of this year and during the Extended School Year ("ESY") programming, S.S. began to strongly resist going to school.  (*Id.* at 7.)

S.S. began the 2017-2018 school year at John Archer.   (*Id.*)   In anticipation of S.S.'s annual IEP meeting, S.S.'s teacher performed a Verbal Behavior Milestones Assessment and Placement Program ("VB-MAPP") assessment on September 20, 2017 in order to assess the barriers that might impede S.S.'s language and skill acquisition.   (Hr'g Decision at 12.)   The results showed several barriers that required further analysis.   (*Id.*)

Five days later on September 25, 2017, the Parents met with S.S.'s new IEP team at John Archer.   (*Id.*)   At this meeting, the Parents expressed their concerns about S.S.'s significantly intensifying problematic behaviors, including hitting herself in the head, so hard that she left bruises, and pulling her own hair.   (Compl. 7, ECF No. 2.)   The team discussed the possibility of moving forward with a Functional Behavioral Assessment ("FBA").   (*Id.*) The administrative record in this case reflects that this new IEP team was unaware that such as assessment had already been recommended in May of that same year.   (*Id.*)   The team, however, could not at this point actually approve its decision to order an FBA because the school's psychologist, who would be responsible for overseeing the FBA, was not at the meeting.   (*Id.*)   She testified that she was also unaware of the previous decision to conduct an FBA and generally of S.S.'s behavioral needs.   (*Id.*)   Therefore, the IEP team reconvened on October 11, 2017 and authorized an FBA to develop a BIP, which would begin October 11, 2017 and continue through November 14, 2017.   (Hr'g Decision at 12.)

At this meeting, the Parents also approved a revised IEP.   (*Id.*)   This IEP called for thirteen hours and twenty minutes of specialized instruction and three hours per month of related services (speech and occupational therapy).   (*Id.* at 13.)   It contained eight goals and thirty-six objectives, again with no goals related to behavior.   (*Id.*)   S.S. at this time was also

again approved for ESY services from July 2, 2017 to August 10, 2017 for three hours and twenty minutes per week. (*Id.*)

On November 14, 2017, Mrs. S. visited John Archer for American Education Week. (Compl. 8, ECF No. 2.) While observing S.S.'s class, Mrs. S. witnessed a boy in the class attack and scratch S.S. (*Id.*) When she expressed alarm, Mrs. S. was told that similar incidents had occurred before, and the boy had been seen targeting S.S. with aggressive attempts and behaviors on previous occasions. (*Id.*) On November 16, 2017, Mrs. S. emailed John Archer's principal about the attack, and the Parents requested a written plan of action. (*Id.* at 9.) The Parents said that S.S. would not return to school until such plan was made, and they requested that one of the students be moved to a different classroom. (*Id.*) The IEP team then met on November 27, 2017 to discuss S.S.'s intensifying behaviors, some of which were believed to be linked to the aggression of her classmate. (*Id.*) John Archer proposed a "safety plan" which outlined strategies such as purposeful blocking, ensuring safe distances between the students, and ignoring aggressive behaviors. (*Id.*) S.S. returned to school on November 28, 2017. (*Id.*) On December 19, 2017, the same classmate grabbed the back of S.S.'s neck, and although S.S. was not injured, the incident prompted the school to move the boy to a different classroom. (Hr'g Decision at 14.)

On January 2, 2018, the IEP team met to review the results of the FBA and BIP and to revise S.S.'s IEP to, for the first time, include behavioral goals. (Hr'g Decision at 14.) The FBA had focused on S.S.'s self-hitting and vocal stereotypy. (*Id.* at 13.) The self-hitting was described as "hitting herself in the forehead or side of the head utilizing her arm or closed fist." (*Id.*) Vocal stereotypy was described as "nonfunctional communication." (*Id.*)

The results of the FBA showed that S.S. was hitting herself in the head an average of seventeen time per day for one to thirty seconds, and that she engaged in vocal stereotypy twelve times every ten minutes for one to five seconds. (*Id.*) At this meeting, the Parents expressed concerns about additional behaviors not covered in the FBA. (*Id.* at 14.) Mr. S. expressed his concern that S.S. was not progressing and that she was "cowering" from peers and adults, throwing tantrums, and isolating herself from family members. (*Id.*) At this point, Dr. McLaughlin as well as Kristen Colyer, a Board Certified Behavior Analyst ("BCBA") contracted by HCPS, had also observed S.S. at John Archer. (Compl. 10, ECF No. 2.) The administrative record reflects that both experts observed S.S. to be completely disengaged and isolated in the classroom, demonstrating self-stimulatory behaviors as she remained completely unable to access activities and instruction given by the teacher. (*Id.*) The experts saw this behavior continuously reinforced by the errors of her teacher, who did not appear to have the proper training to deal with the situation. (*Id.*) In response to these observations, the school and the Parents consented to an additional FBA. (*Id.*)

The second FBA was conducted from January 3, 2018 to January 26, 2018. (Hr'g Decision at 14.) This FBA included the self-hitting and vocal stereotypy, as well as aggression and self-stimulation. (*Id.*) The results showed self-hitting for an average of eighty-nine times per day for one to two seconds (the number of incidents in a day ranged from two to 395), vocal stereotypy an average of eighteen times every ten minutes for one to fifteen seconds, aggression an average of nine times per day for one to three seconds, and self-stimulation an average of six times per day for five seconds to five minutes. (*Id.*)

When the IEP team met to review the results from this second FBA on February 5,

2018, Mr. S. made two requests. (*Id.* at 15.)  First, he claimed that the ESY program contained in the IEP was inadequate and that the Parents wanted a year-round education program for S.S. (*Id.*)  Mr. S. also requested that the IEP provide for three additional hours of BCBA consultation inside the Student's classroom. (*Id.*)  HCPS stated that the current data did not support the need for a twelve-month program, but indicated that the ESY matter could be revisited if additional data become available. (*Id.*)  HCPS rejected the BCBA consultation request as well. (*Id.*)  As a result, at this February 2018 meeting, the Parents informed HCPS that they planned to withdraw S.S. from HCPS and enroll her for the remainder of the school year at the Trellis School, a Maryland state-approved, year-round non-public special education school in Baltimore County. (*Id.*; Compl. 12, ECF No. 2.) They requested tuition reimbursement from HCPS. (Hr'g Decision at 15.)  S.S.'s last day at John Archer was February 6, 2019. (*Id.*)

S.S. began attending Trellis School in February 2018, at parent expense. (Compl. 12, ECF No. 2.)  Within a few weeks, the Parents reported a noticeable change in S.S.'s behavior and well-being. (*Id.*)  She no longer resisted going to school, she showed greater awareness and engagement both at school and at home, and she began to gain weight and show notable improvements in her health. (*Id.*)

Around March 27, 2018, the attorney for HCPS advised the Parents that their request for placement and funding at Trellis was rejected, claiming that John Archer was an appropriate placement for S.S. (*Id.*)  This did not end the relationship between the Parents and HCPS.  The Parents continued to work with HCPS through the IEP process. (*Id.* at 13.) This included additional meetings with and assessments completed by HCPS employees.

(*Id.*)   After consideration of the assessment and observation data, HCPS continued to maintain that the program and placement at John Archer were appropriate.  (*Id.*)  Although, on November 7, 2018, HCPS did agree to modify her IEP to include fifteen hours of special education instruction per week, including adapted physical education, and two hours and fifteen minutes per week of related services (speech, occupational therapy, and physical therapy).  (*Id.*)

Ultimately, on January 25, 2019 the Parents filed a Complaint for a Due Process Hearing in accordance with state and federal laws alleging:

a.   The IEPs and educational program provided to S.S. by HCPS at Homestead-Wakefield Elementary School for the 2016-2017 school year, including summer 2017, were inadequate and failed to provide her with a FAPE.

b.   The IEPs and educational program provided and/or offered to S.S. at John Archer for the 2017-2018 school year and through the fall of 2018 were inadequate and failed to provide her a FAPE.

c.   The IEP developed for S.S. in November 2018 did not adequately address her educational needs or provide adequate special education instruction and did not offer her a FAPE for the 2018-2019 school year.

d.   The Trellis School has provided S.S. with an appropriate education and S.S. has made progress in all areas since starting at Trellis to the present.

(*Id.* at 13-14.)  The Parents sought an order requiring compensatory educational service to compensate S.S. for HCPS's failure to provide a FAPE from September 2016 to February 2018, and an order requiring HCPS to reimburse S.S.'s parents for the costs of S.S.'s placement at the Trellis School including tuition, related services, transportation expenses, and any other such expenses related to S.S.'s education at the Trellis School.  (*Id.* at 14.)

A due process hearing was held over eight days in April and May of 2019 before ALJ

13

Michael D. Carlis.  (*Id.*)  On June 7, 2019, ALJ Carlis denied all remedies sought by S.S. and her parents.  (Hr'g Decision at 102.)  The ALJ held that the Parents did not prove that HCPS failed to offer S.S. a FAPE for the 2016-2017, 2017-2018, and 2018-2019 school years and that the Parents failed to prove that they are entitled to reimbursement for tuition and expenses at Trellis School.  (*Id.*)

Upon removing this case to this Court, the Parents now allege that the ALJ's decision is contrary to substantial evidence and uncontroverted testimony presented by the Parents. (Compl. 15, ECF No. 2.)  Count 1 of the Parents' Complaint alleges violations of the IDEA, claiming that the ALJ erred as a matter of law in his findings and that his decision was not "regularly made."  (*Id.* at 16-17.)  Count 2 alleges violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), and its implementing regulations at 34 C.F.R. Part 104.  (*Id.* at 18.)  Specially, the Parents claim that HCPS discriminated against S.S. solely by reason of her disability, acting with bad faith, gross misjudgment, and, in some instances, deliberate indifference. (*Id.* 18-19.) Count 3 alleges violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.* and its implementing regulations at 28 C.F.R. Part 25 in the same manner as Count 2.  The Parents seek an order for equitable and declaratory judgment, stating that the ALJ's analysis and decision contained mistakes of law that were flawed and clearly erroneous; for $30,000 for the harm caused to S.S. as a result of HCPS's discriminatory practices; for compensation for HCPS's failure to provide a FAPE for each of the school years; and to reimburse S.S.'s parents for the costs of her placement at Trellis School, including tuition, related services, transportation expenses, and any other such expenses related to S.S.'s education at Trellis.  (*Id.* at 21.)

On June 5, 2020, the Parents moved for Summary Judgment.  (*See* ECF No. 33.)  The Defendants filed a Cross Motion for Summary Judgment.  (*See* ECF No. 36.)

## STANDARD OF REVIEW

In Individuals with Disabilities Education Act ("IDEA") cases, this Court conducts "modified de novo review, giving due weight to the underlying administrative proceedings." *M.L. by Leiman v. Smith*, 867 F.3d 487, 493 (4th Cir. 2017) (quoting *O.S. v. Fairfax Cnty. Sch. Bd.*, 804 F.3d 354, 360 (4th Cir. 2015)).  This Court's analysis necessarily involves a review of the administrative record.  "Generally, in reviewing state administrative decisions in IDEA cases, courts are required to make an independent decision based on a preponderance of the evidence, while giving *due weight* to state administrative proceedings."  *Doyle v. Arlington Cnty. Sch. Bd.,* 953 F.2d 100, 103 (4th Cir. 1991) (emphasis added) (citing *Rowley*, 458 U.S. at 206).  In *Doyle*, the U.S. Court of Appeals for the Fourth Circuit carefully considered how to apply the "due weight" requirement.  *Id.* at 104-05.  The Fourth Circuit concluded that level of deference given to findings of fact depends on whether the administrative officer's findings were "regularly made."  *Id.* at 105.  A reviewing court "should examine the way in which the state administrative authorities have arrived at their administrative decision and the methods employed."  *Id.*  If the reviewing court finds that the administrative authority has departed "far from the accepted fact-finding process," the fact-finding is not "regularly made."  *Sumter Cnty. Sch. Dist. 17 v. Heffernan ex rel. T.H.*, 642 F.3d 478, 485 (4th Cir. 2011) (quoting *Doyle*, 953 F.2d at 104).  In other words, "[f]actual findings must be 'reasoned and supported by the record' to warrant deference.'" *M.H. v. New York City Dept. of Educ.*, 686 F. 3d 217, 241 (2d Cir. 2012) (quoting *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F. 3d 105, 114 (2d Cir.

2007)).  When the reviewing court does find the fact-finding of the administrative officer to be regularly made, such findings are "entitled to be considered *prima facie* correct, akin to the traditional sense of permitting a result to be based on such fact-finds, but not requiring it." *Id.* at 105 (citing *New York Transit Author. v. Beazer,* 440 U.S. 568, 587, n.31 (1979)).

To be clear, "due weight" requires that when fact-findings are regularly made, they are entitled to *prima facie* correctness.  However, this does not mean that a district court must follow the administrative officer's findings and legal conclusions.  *See Springer v. Fairfax Cnty. Sch. Bd.*, 134 F.3d 659, 663 n.* (4th Cir. 1998) (concluding that *Doyle* did not require that deference be given to an administrative opinion that was "both cursory and conclusory").  If a reviewing court disagrees with the administrative officer's findings and fails to adhere to them, "it is obligated to say why." *M.M. ex rel. D.M. v. School Dist. of Greenville Cnty.*, 303 F.3d 523, 531 (4th Cir. 2002).  But, "[a]fter giving the administrative fact-findings such due weight, if any, the district court then is free to decide the case on the preponderance of the evidence, as required by statute." *Doyle*, 953 F.2d at 105.

Additionally, even if the factual findings are found to be "regularly made," the district court must still make its own independent determination regarding the legal conclusions that have been drawn by the administrative officer.  *Sumter Cnty. Sch. Dist. 17 v. Heffernan ex rel. TH*, 642 F.3d 478, 485 (4th Cir. 2011).  The district court may accept the administrative officer's factual findings but find that the evidence, considered as a whole, points to a different legal conclusion than that reached by the officer.  *Id; see also Gerstmyer v. Howard Cnty. Pub. Schs.*, 850 F. Supp. 361, 364 (D. Md. 1994) (accepting the facts as found by the administrative officer but finding such facts compelled a different legal conclusion).  This is

"entirely appropriate and consistent with the district court's obligation to make its own independent determination." *Hefferman*, 642 F.3d at 485.

## ANALYSIS

### I.    Alleged Violations of the IDEA (Count 1)

The Parents argue that the ALJ erred in concluding that they did not meet their burden of proving that HCPS denied S.S. a FAPE for the 2016-2017, 2017-2018, and 2018-2019 school years and as relief seek reimbursement for the costs they incurred for S.S.'s placement at the Trellis School.  The Parents argue that many of the ALJ's findings of fact were not "regularly made" and therefore do not warrant deference.  (ECF No. 33-1).  They further argue that even if the ALJ's findings are due deference, the ALJ's conclusions on the record are incorrect as a matter of law.  (*Id.*)

#### A.  Regularly Made

The Fourth Circuit interprets *Rowley*'s "due weight" requirement to mean that the findings of fact made in state administrative proceedings must "be considered prima facie correct, akin to the traditional sense of permitting a result to be based on such fact-finding, but not requiring it."  *Doyle*, 953 F.2d at 105.  If the findings are not "regularly made," they are not entitled to deference.  *Id.*  When determining whether a hearing officer's findings were regularly made, the Fourth Circuit's cases have "typically focused on the *process* through which the findings were made."  *J.P. ex rel. Peterson v. Cnty. Sch. Bd. of Hanover Cnty., Va.*, 516 F.3d 254, 259 (4th Cir. 2008).

The Parents argue that the ALJ incorrectly reviewed, interpreted, and assessed the weight of the evidence.  (ECF No. 33-1 at 6-9.)  They argue that the ALJ's decision included

inconsistent and incorrect characterizations of data related to S.S.'s progress, the foundation

for determining whether HCPS provided FAPE.   (ECF No. 39-1.)   However, factual

findings are only considered not "regularly made" if they are "reached through a *process* that

is far from the accepted norm of a fact-finding process." *Cnty. Sch. Bd. of Henrico Cnty, Va. v.*

*Z.P.*, 399 F.3d 298, 305 (4th Cir. 2005) (emphasis added) (internal quotations omitted).   This

Court finds that the fact-finding process used by the ALJ in this case did not stray from the

"accepted norm."   In *J.P.*, the Fourth Circuit reversed a district court's rejection of the

hearing officer's fact-finding in which the process used by the ALJ was analogous to the case

at hand.   *J.P.*, 516 F.3d at 259-60.   The court explained:

> In this case, there is nothing in the record suggesting that the hearing officer's
> process in resolving this case was anything other than ordinary.   That is, the
> hearing officer conducted a proper hearing, allowing the parents and the
> School Board to present evidence and make arguments, and the hearing
> officer by all indications resolved the factual questions in the normal way,
> without flipping a coin, throwing a dart, or otherwise abdicating his
> responsibility to decide the case.   Indeed, none of the deficiencies in the
> hearing officer's opinion identified by the district court have anything to do
> with the process through which the hearing officer made the required factual
> findings; as we will explain, the district court's criticisms instead focus on the
> manner in which the hearing officer expressed his view of the case.

*Id.*   The Fourth Circuit further criticized the district court's rejection of the administrative

findings due to the court's belief that the "hearing officer's opinion was insufficiently

detailed."   *Id.* at 261.   The court noted that "our case law never suggested that any particular

level of detail is required in the hearing officer's decision" and that the "level of detail

required of a hearing officer is relatively low."   *Id.* at 262.   The Parents' complaints regarding

the fact finding of the ALJ do not relate to the process used by the ALJ but instead to his

interpretation and characterization of the data.   For this reason, the ALJ's findings are

considered "regularly made" and this Court will give such findings the due weight required by *Rowley*.

### B. FAPE for the 2016-2017 School Year

For the 2016-2017 school year, S.S. attended pre-school at Homestead-Wakefield Elementary School.  (Hr'g Decision at 10.)  As the facts above provide, S.S. attended four half days per week for approximately twelve hours per week.  (*Id.*)  Her IEP written in September 2016 stated that she would receive twenty-five hours of special education instruction and related services (speech-language therapy, occupational therapy) per month, or approximately six hours and fifteen minutes per week.  (*Id.*)  At the start of this school year, S.S. was not noted to have any behavioral challenges, and her IEP included no goals to address behavior.  (*Id.*)  "Judicial review of IEPs under the IDEA is meant to be largely prospective and to focus on a child's needs looking forward; courts thus ask whether at the time an IEP was created, it was 'reasonably calculated to enable the child to receive educational benefits.'"  *Schaffer v. Weast*, 554 F.3d 470, 477 (4th Cir. 2009) (quoting *Rowley*, 458 U.S. at 207).  There is no evidence in the record regarding the inappropriateness of the Student's placement at Homestead-Wakefield or the insufficiency of this September 2016 IEP when it was created at the start of S.S.'s first school year in an HCPS school.

The Parents' dissatisfaction with HCPS began towards the end of the 2016-2017 school year in April 2017.  At that time, S.S.'s teacher reported that S.S. had not demonstrated satisfactory growth/progress on their IEP goals and objectives due to increased behavioral needs.  (*See* Compl. 4, ECF No. 2.)  The fact that S.S. was not meeting her IEP goals does not in and of itself suggest a denial of FAPE.  As the Court held in

*Rowley*, the IDEA requires only that school districts provide an "appropriate" IEP that confers "some educational benefit." *Rowley*, 458 U.S. at 200. For this reason, "progress, or lack thereof, while important, is not dispositive." *M.S. ex rel. Simchick v. Fairfax Cnty. Sch. Bd.*, 553 F. 3d 315 (4th Cir. 2009). A student's educational program is not inappropriate when the student does not achieve all of the goals and objectives in the IEP. *O.S. v. Fairfax Cnty. Sch. Bd.*, 804 F.3d 354, 360-61 (4th Cir. 2015). The ALJ found that S.S. achieved "two of the seven goals and twenty of the twenty-six objectives." (Hr'g Decision at 88.) While the school felt a need to meet to discuss how S.S.'s behavior problems were interfering with S.S.'s further progress, such concerns related to S.S.'s behavior do not suggest her IEP was substantively inadequate. For these reasons, this Court agrees with the ALJ that the Parents did not meet their burden to prove that S.S.'s IEP at Homestead-Wakefield for the 2016-2017 school year was not reasonably calculated to enable her to make progress in light of her circumstances, especially given the behavioral concerns were not known at the start of the school year when the IEP was written. Substantively, there was no problem with the IEP for the 2016-2017 school year.

However, the Parents argue that S.S. was denied FAPE in the 2016-2017 school year primarily due to HCPS's failure to develop a BIP pursuant to an FBA when S.S.'s behavioral problems became apparent sometime during the 2016-2017 school year. (*See* ECF No. 33-1 at 10-11.) The Parents suggest that when the behavioral issues did emerge sometime during the 2016-2017 school year, HCPS had an obligation to either revise S.S.'s IEP to include behavior goals or, if not directly alter the IEP, draft behavior goals in a BIP. (ECF No. 33-1 at 10.) The failure to do so, they claim, was a procedural violation of the IDEA.

HCPS claims that such procedural violation was not raised in the Plaintiffs' Due Process Complaint (ECF No. 2), nor presented to the ALJ for determination at the time of the Hearing, and therefore, it is inappropriate for this Court to address such claim.  (*See* ECF No. 36-1 at 28.)  That argument is without merit, and the issue is properly presented before this Court.  The Complaint alleges that ALJ's errors include a failure to find that "HCPS violated S.S.'s rights under the IDEA in failing to amend S.S.'s IEP or educational program during the 2016-2017 school year, despite evidence of her failure to make appropriate progress in the program."  (ECF No. 2 at 15.)  Further, the Parents allege in Count 1 of their Complaint that the ALJ erred as a matter of law in finding that HCPS provided S.S. a FAPE in the 2016-2017 school year.  (ECF No. 2 at 16.)  As provided above, a claim for violation of the IDEA involves a two-step inquiry, as articulated in *Rowley*.  First, this Court must determine whether the state or local educational authority complied with the procedures set forth in the Act.  *Rowley*, 458 U.S. at 206.  Second, this Court must determine whether the IEP was reasonably calculated to enable the child to receive educational benefits.  *Id.* at 207.  Thus, any allegation that a school system has denied the student a FAPE in violation of the IDEA involves a challenge to both the procedure and substance of the student's IEP.  Additionally, as their Complaint provides, the Parents' Complaint for Due Process Hearing filed January 25, 2019 included the claim that HCPS failed to provide a FAPE for the 2016-2017 school year, ensuring that the procedural issue of the failure to alter her educational plans to include the behavioral issues was before the ALJ.

Although the Parents have properly brought this procedural claim before this Court, this Court finds there was no such procedural violation in the 2016-2017 school year.  A

local educational agency is required to ensure that the IEP team "reviews the child's IEP periodically, but not less frequently than annually, to determine whether the annual goals for the child are being achieved" and "revise the IEP as appropriate to address . . . a lack of expected progress." 20 U.S.C. § 1414(d)(4)(A)(ii).  HCPS met this requirement in reviewing S.S.'s progress and calling an IEP meeting to discuss her progress in April 2017.  (ECF No. 2 at 5.)  At this meeting, the IEP team proposed and the parents agreed that an FBA was necessary to guide the development of an appropriate BIP.  (*Id.*)  By recommending these steps be taken in response to notable changes in S.S.'s behavior at school, HCPS acted appropriately at the close of the school year.  S.S. was not denied a FAPE for the 2016-2017 school year.

### C. FAPE for the 2017-2018 and 2018-2019 School Years

The Parents argue that S.S. was denied a FAPE for both the 2017-2018 and 2018-2019 school years for several reasons.  The Parents' first argument is based on a procedural violation of the IDEA in the 2017-2018 school year.  The Parents additionally address the substance of S.S.'s IEPs.  S.S.'s IEP for the 2017-2018 and 2018-2019 school years were substantively the same, but for an increase in the number of special education instructional hours per week in 2018.  (*See* Hr'g Decision at 89.)  The Court will, therefore, address the substantive adequacy of the IEPs for the 2017-2018 and 2018-2019 school years in tandem.

### a. Whether HCPS Complied with the Procedural Requirements of the IDEA

First, the Parents argue that the ALJ erred as a matter of law in finding that the failure of HCPS to develop a BIP or to adequately address S.S.'s interfering behaviors through the

IEP did not deny S.S. a FAPE.   (ECF No. 33-1 at 14.)   Following the discovery of behavioral issues at the end of the 2016-2017 school year, S.S. was referred to the Central IEP team on May 31, 2017 to determine her placement for the 2017-2018 school year. (Compl. 6, ECF No. 2)  As provided in the factual background above, this Central IEP team appeared to have preliminary data regarding S.S.'s interfering behaviors in school, which led to her placement at John Archer, but her IEP was not amended at that time.  (*Id.* at 6-7.)  In September 2017, S.S.'s new IEP team at John Archer was apparently completely unaware of the FBA and BIP that had allegedly been "in process" in May.  (*Id.* at 8.)  At the meeting, the parents shared their concerns about S.S.'s significantly increasing behavioral problems, and the team discussed the possibility of engaging in assessment to develop a BIP for these behaviors, but because the school's psychologist was not present at the IEP meeting, the team could not move forward with assessment.  (*Id.*)  The psychologist, who would be the party responsible for overseeing a behavioral assessment, claims that she had been unaware of S.S.'s behavioral needs.  (*Id.*)  On October 11, 2017, the IEP team, including the psychologist, met again to continue the annual review of S.S.'s IEP, and for the second time, a team concluded that an Functional Behavior Assessment ("FBA") was needed.  (*Id.*)  An FBA was finally conducted, and a Behavioral Intervention Plan was implemented ("BIP"). (ECF No. 39 at 22.)

The ALJ found that the record "does not explain what happened to the BIP that was being developed in May 2017" (Hr'g Decision at 97) and does not appear to opine on why the IEP team for the 2017-2018 school year was unaware of S.S.'s behavioral issues which were of such concern at the end of the 2016-2017 school year.  This Court's review of the

record also cannot explain the cause of this error.  However, the ALJ's conclusion that such error "has no import on the issue of the adequacy of the Student's IEP," (*id.*), is not supported by the record in this case and is not entitled to deference by this Court.  *See Springer*, 134 F.3d at 663 n.* (concluding no deference was required where administrative opinion was "both cursory and conclusory).

As provided above, when determining whether an IEP complies with the IDEA, courts make a two-part inquiry.  *Rowley*, 458 U.S. at 206.  The first part of such inquiry is procedural, namely, whether the state has complied with the procedures set forth in the IDEA.  *Id.*  As this Court has found, "failure to comply with the IDEA's procedural provisions may be a sufficient basis for finding that the local educational agency failed to provide a student with a FAPE."  *Bd. of Educ. of Frederick Cnty. v. I.S. ex rel. Summers*, 325 F. Supp. 2d 565, 580 (D. Md. 2004); *see also Gerstmyer*, 850 F. Supp. at 364.  When a procedural defect exists, the court is "obliged to assess whether it resulted in the loss of an educational opportunity for the disabled child, or whether, on the other hand, it was a mere technical contravention of the IDEA."  *M.M.*, 303 F.3d at 533 (4th Cir. 2002) (quoting *Gadsby v. Grasmick*, 109 F.3d 940, 956 (4th Cir. 1997)).  "The failure to conduct an adequate FBA is a serious procedural violation because it may prevent the [IEP team] from obtaining necessary information about the student's behaviors, leading to their being addressed in the IEP inadequately or not at all."  *R.E. v. New York City Dept. of Educ.*, 694 F.3d 167, 190 (2d Cir. 2012); *accord Z.B. v. D.C.*, 888 F.3d 515, 524 (D.C.C. 2018).  A failure to conduct an FBA will not always rise to the level of a denial of FAPE, but "when an FBA is not conducted, the court must take particular care to ensure that the IEP adequately addresses the child's

problem behaviors." *R.E.*, 694 F.3d at 190.  For example, in *Rosaria M v. Madison City Bd. of Educ.*, 325 F.R.D. 429, 439 (N.D. Ala. 2018), the court found that a student's IEP was not legally inadequate where the school did not conduct an FBA but still noted the student's behavioral issues and created and implemented a plan to address the student's most problematic behaviors.

Although in the case at hand an FBA was eventually conducted after the October 2017 IEP meeting, this was a full six months after an IEP initially decided an FBA was necessary, as well as after S.S.'s October IEP for the 2017-2018 year was developed.  This unexplainable delay prevented S.S.'s 2017-2018 IEP from addressing her behavioral issues at all until January 2018, an entire nine months after S.S.'s behavioral problems were initially recognized to be interfering with her progress toward her IEP goals.  This is significant.  In *Gerstmyer*, Judge Motz of this Court held that a student was denied a FAPE, reversing the decision of the Hearing Officer, when a student experienced a similar delay in assessment. 850 F. Supp. 361.  In that case, the student's parent notified the school board in May that her son needed an evaluation for a possible learning disability.  *Id.* at 365.  Despite this notification in May, the student began the next school year "in a state of complete disarray" without any accommodations based on his discovered learning disability.  *Id.*  Judge Motz found that the school board "had been notified almost four months before [the student]'s first grade year was to commence that he needed evaluation for a possible learning disability but almost six months thereafter had failed to formulate an IEP that was 'individualized' in anything but name only."  *Id.* at 365-66.  "The ultimate fact is that [the student]'s critical first grade year began without an IEP being in place or ready to be in place, and as a result, he

was denied the [FAPE] to which he was entitled." *Id.* at 366. Judge Motz agreed with the parent's decision to move the child to a private school after this failure and awarded tuition reimbursement. *Id.*

Although in the case at hand S.S. did have an IEP in place to start the 2017-2018 school year, her IEP was substantively inadequate due to a similar failure to conduct a necessary assessment. As the U.S. Court of Appeals for the District of Columbia has held, "[t]he key inquiry regarding an IEP's substantive adequacy is whether, taking account of what the school knew or reasonably should have known of a student's needs at the time, the IEP offered was reasonably calculated to enable the specific student's progress." *Z.B.*, 888 F.3d at 524 (citing *Endrew F.*, 137 S. Ct. at 999). Additionally, "[t]he IDEA . . . recognizes that the quality of a child's education is inextricably linked to that child's behavior, and hence an effective educational evaluation must identify behavioral problems." *Harris v. Dist. of Columbia*, 561 F. Supp. 2d 63, 68 (D.D.C. 2008). The ALJ found that "[a]lthough the HCPS *had reason to know* that the Student had problem behaviors that could be significant barriers to learning when she entered John Archer based on the records from the [Central IEP team] meeting, a formal development of a BIP and subsequent modification of the IEP had to wait for the completion of the FBA." (Hr'g Decision at 98) (emphasis added). Based on the ALJ's findings, despite HCPS's knowledge of S.S.'s serious behavioral problems, her October 2017 IEP did not and could not have adequately addressed S.S.'s serious behavioral issues, making it difficult for this Court to say that the IEP was reasonably calculated to enable S.S.'s progress. This procedural violation of the IDEA contributed to a denial of a FAPE in the 2017-2018 school year.

### b. Whether the 2017-2018 and 2018-2019 IEPs Were Reasonably Calculated to Enable S.S. to Receive Educational Benefits

Even if this Court accorded deference to the ALJ's view that the late addition of the BIP was "of no import," there are further reasons S.S.'s IEP was inadequate and S.S. was denied FAPE for the 2017-2018 school year, as well as for 2018-2019 school year. S.S.'s IEP, even as amended, did not address all of her behavioral problems, nor does it appear that the IEP successfully addressed those behaviors that it did identify and target. HCPS also denied S.S. increased behavioral analysis consultation, despite evidence of teachers' mistakes in implementing her amended IEP and the severity of her behavioral issues. Additionally, although the Parents did not meet their burden to show that HCPS's denial of S.S.'s enrollment in a year-round educational program was required to provide FAPE, the Parents did present persuasive arguments to suggest that S.S.'s IEP should have explicitly required more time in special education per month. Combined, these problems with S.S.'s IEPs suggest that S.S. was substantively denied FAPE for the 2017-2018 and 2018-2019 school years. Data regarding S.S.'s progress during her time at John Archer further supports this conclusion.

First, even when S.S.'s IEP was updated to address her behavioral problems in January 2018, it did not address all of her behavioral issues. In February 2018, S.S.'s IEP was amended again to address her self-injurious behaviors, stereotypy, aggression, and self-stimulatory behavior after an additional FBA. (Compl. 10, ECF No. 2.) However, neither the IEP nor a BIP addressed other behaviors that were occurring at school. For example, S.S. had a noticeable bald spot from her trichotillomania that went unaddressed. (*Id.*; *see also* Testimony of Mr. S., Hr'g Tr. Vol 6 at 1427:20-1428:7; Student Ex. 69.) Hearing testimony

also establishes that S.S. was noticeably cowering from peers and adults.  (*Id.*; *see also* Testimony of Kim Manzo, Hr'g Tr. Vol. 6 at 1336:12-18.)  The record clearly indicates that such behavior was not addressed.  HCPS was on notice of these issues and did not address them.  "The key inquiry regarding an IEP's substantive adequacy is whether, taking account of what the school knew or reasonably should have known of a student's needs at the time, the IEP offered was reasonably calculated to enable the specific student's progress."  *Z.B.*, 888 F.3d at 524 (citing *Endrew F.*, 137 S. Ct. at 999).  Again, this Court finds it difficult to say that S.S.'s IEP was reasonably calculated to enable her to make progress given that it did not address, even after the second FBA, these significant behavioral issues.

Second, the behaviors that were addressed by IEP amendments in January 2018 did not improve with the implementation of the BIP.  (*See* Hr'g Decision at 96-98.)  The ALJ found that S.S.'s self-hitting and vocal stereotypy actually increased, although he found it difficult to measure by how much self-hitting increased.  (*Id.* at 97.)  However, the ALJ dismissed alleged increases, regardless of how significant.  (*Id.* at 98.)  The ALJ adopted the theory that if there was a decline in S.S.'s behavior, it was likely "a burst in behavior" common after a BIP is implemented.  (*Id.*)  This conclusion is simply not supported by the administrative record in this case.  Any due deference accorded to the ALJ does not preclude this Court from making an independent decision based on a preponderance of the evidence in this case, which reflects serious behavioral issues.  *See Doyle*, 953 F.2d at 103.

Even if the decline in S.S.'s behaviors may be explained by a "burst in behavior" theory, self-injurious behavior is a serious matter, and an increase in the frequency and intensity of such behavior, regardless of the cause, is undoubtedly quite alarming for any

parents to witness.  In response to an escalation in S.S.'s behaviors, the Parents requested more involvement of a Board Certified Behavior Analysist ("BCBA") to oversee S.S.'s programming and ensure proper implementation of the behavioral programming, seeking consultation with the BCBA three times per week.  (Compl. 11, ECF No. 2.)  They further requested that HCPS place S.S. in a twelve-month program, where she would receive the hours of service and instruction that they, as well as experts, believed was necessary in order for her to make appropriate progress.  (*Id.*)  HCPS denied both of these requests.  (*Id.*)

The ALJ found that the denial of additional BCBA consultation hours and the refusal to enroll S.S. in a twelve-month program could not be denials of FAPE.  (Hr'g Decision at 99.)  On the issue of the BCBA consultation hours, the ALJ found that S.S.'s removal from John Archer was essentially premature.  (*Id.*)  He found that S.S. attended school for only fifteen days between the time the BIP was implemented and the Parents' withdrawal from HCPS.  (*Id.*)  He concluded that "fifteen days is too short a period of time to make any reasonable determination that an increase in BCBA was necessary for the BIP to be effective."  (*Id.*)  This Court notes that an increase in self-injurious behavior is a very serious matter and accords no deference to the ALJ's conclusion that fifteen days is insufficient to determine whether further measures needed to be taken.  This conclusion is especially suspect given it only took three weeks at Trellis for S.S. to be noticeably happier in her new environment.  (Hr'g Decision at 60.)  However, even if the fifteen days were not enough time to collect data regarding S.S.'s changes in behavior, within this fifteen-day window, Dr. McLaughlin did notice a need to correct S.S.'s teacher's errors in her implementation of the BIP and IEP.  (Hr'g Decision at 46; *see also,* Testimony of Annie McLaughlin, Hearing Tr.

Vol. 3 at 545:20-546:4.)  Further, HCPS had more than fifteen days' worth of information
with which to make a decision about the need for increased BCBA consultation.  As Dr.
McLaughlin testified, S.S. had very serious behavioral issues that required the administration
of careful instruction.  (Testimony of Annie McLaughlin, Hr'g Tr. Vol. 3 at 545:20-546:4.)
This combination of errors in teaching and known complexity of S.S.'s treatment led Dr.
McLaughlin to conclude that the Parents' request for additional BCBA consultation should
have been granted.  (*Id.*)  Further, as Dr. McLaughlin provided, even if there was progress
made with the implementation of the BIP in those fifteen days, more BCBA hours would
still have been appropriate to ensure that support was maintained and progress could
continue.  (Testimony of Annie McLaughlin, Hr'g Tr. Vol. 3 at 5543:16-544:3.)

On the issue of HCPS's refusal to enroll S.S. in a twelve-month program, this Court
does find significant evidence such a program is appropriate for S.S.   However, it cannot be
necessarily said that this denial alone constituted a denial of FAPE.  When deciding whether
a child requires Extended School Year ("ESY") services, an IEP team must address the
following in accordance with Maryland law:

    (i) Whether the student's IEP includes annual goals related to critical life skills;

    (ii) Whether there is a likelihood of substantial regression of critical like skills caused
        by the normal school break in the regular school year and a failure to recover
        those lost skills in a reasonable time;

    (iii) The student's degree of progress toward mastery of IEP goals related to critical
        life skills;

    (iv) The presence of emerging skills or breakthrough opportunities;

    (v) Interfering behaviors;

    (vi) The nature and severity of the disability; and

(vii) Special circumstances.

COMAR 13A.05.01.08(2)(b).  In *M.M. ex rel. D.M*, the Fourth Circuit also addressed the issue of an Extended School Year and held that such services, generally, are necessary to a FAPE when "the benefits a disabled child gains during a regular school year will be significantly jeopardized if he is not provided with an educational program during the summer months."  303 F.3d at 537-38.  The Fourth Circuit was clear that "a showing of actual regression is not required" and that the need for such services may be established by "expert testimony."  *Id.* at 538.  The Court was equally clear that "the mere fact of regression is not a sufficient basis" to support a claim for an Extended School Year, "because all students, disabled or not, may regress to some extent during lengthy breaks from school." *Id.*  Therefore, extended services are required under the IDEA "only when such regression will substantially thwart the goal of 'meaningful progress.'"  *Id.* (quoting *Polk v. Cent. Susquehanna Intermediate Unit 16*, 853 F.2d 171, 184 (3d Cir 1988).

When the Parents removed S.S. from John Archer, S.S. was enrolled in a ten-month program with ESY.  (Hr'g Decision at 13.)  Dr. McLaughlin opined that the ten-month program was "highly inappropriate" and that the five-week period when the Student would not receive any services during the summer "would have a highly adverse effect on her performance."  (*Id.* at 42.)  Dr. McLaughlin testified, "for [S.S.] to go the entire summer, from June to September without an introduction of any new material, will highly impact her ability to make progress," as well as to potentially close the gap in areas of deficiency.  (*Id.*) She continued, "if she doesn't continuously, I think year round, work on her skills, she will not make progress, and not end up being able to access her education."  (*Id.*)   Dr.

McLaughlin was not alone in this opinion.  Caitlin Sprouse, an expert in occupational therapy and autism, explained that she too believed S.S. should receive year-round education: "In order for her to continue making progress . . . consistency of those services is extremely important."  (Testimony of Caitlin Sprouse, Hr'g Tr. Vol. 3 at 592:18-593:2).  Amanda Pederson, an expert in autism and special education, also thought that S.S. would regress in her skills with only a ten-month program.  (Testimony of Amanda Pederson, Hr'g Tr. Vol. 3 at 675:13-677:6).  Ms. Pederson noted that her current ESY program only provided for four hours and forty-five minutes of instruction per week for six weeks once the official school year ended" in which there would not be "enough time to meet all of her needs."  (*Id.*)

The record in this case reflects the risk of regression of S.S.  This is an important matter in addressing the denial of S.S.'s enrollment in a twelve-month educational program. The Fourth Circuit has made clear that evidence of actual regression is not required to show that an ESY program is insufficient to provide FAPE, but a court may only say there has been a denial of FAPE when it is shown that the alleged "regression will substantially thwart the goal of 'meaningful progress.'"  *See M.M. ex rel. D.M*, 303 F.3d at 538.  The ALJ discredited Dr. McLaughlin's conclusions, suggesting she did not adequately explain her opinion.  (*Id.* at 94.)  However, the fundamental question is not a ten-month program versus a twelve-month program.

The issue is whether S.S.'s IEPs as written would even provide S.S. "meaningful progress" within the ten months of programming.  In addition to the problems with S.S.'s IEP presented above, S.S.'s IEP was also problematic given the amount of time it required for specialized instruction for S.S. per day.  S.S.'s October 2017 IEP provided thirteen hours

and twenty minutes per week of special education, one hour per month of Occupational Therapy services, and two hours per month of Speech/Language Therapy.  (ECF No. 33-1 at 20.)  In November 2018, the IEP team increased this time to fifteen hours per week and related services by a speech pathologist and an occupational therapist for a total of three hours per month.  (Hr'g Decision at 13.)  These times as written on S.S.'s IEPs would be insufficient to provide S.S. with a FAPE.  Dr. McLaughlin was adamant that these instructional and service hours were inappropriate and insufficient to meet S.S.'s intense academic and behavioral needs, even with the increase in 2018.  (Testimony of Mr. S., Hr'g Tr. Vol. 4 at 773:11-21.)  Dr. McLaughlin testified that S.S. needed thirty hours of special education per week to adequately address all of her issues.  (Testimony of Annie McLaughlin, Hr'g Tr. Vol. 3 at 524:16-18.)  Thirty hours per week would amount to spending each full six-hour school day in special education.  There is no dispute that S.S. required full-time special education services.  (*See* ECF 36-1 at 40.)

However, despite the specific hours written in the IEPs, the ALJ found "that it is unimaginable anyone could look at the IEPs and think that they provided [S.S.] with anything less than full-day of specialized services."  (Hr'g Decision at 90.)  He found that the IEPs repeatedly stated that S.S. would receive daily instructional support from special education teacher and instructional assistants each week and that none of the Student's school time in was to be in general education.  (*Id.* at 90-91.)  To the ALJ, it did not matter that S.S.'s IEPs did not explicitly provide thirty hours of special education instruction each week since, in practice, S.S. was never in general education and being provided with full-time special education.  (*Id.* at 91.)

The ALJ did not adopt a version of a "four corners" rule, prohibiting any testimony about services beyond what is written in the IEP.  *See R.E. v. New York City Dept. of Educ.*, 694 F.3d 167, 185 (2d Cir. 2012).   However, courts have held that testimony may not "support a modification that is materially different from the IEP, and thus a deficient IEP may not be effectively rehabilitated or amended after the fact through testimony regarding services that do not appear in the IEP."  *Id.*  An IEP has been described as a "contract" that "embodies a binding commitment and provides notice to both parties as to what services will be provided to the student during the period covered by the IEP."  *M.C. by and through M.N. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1197 (9th Cir. 2017).  What is written in the IEP does matter.  As John Archer principal Randy Geyer testified, the time provided in IEPs is a "minimum," which factors into consideration scenarios like "days off school, absences, school closures, and whatnot to make sure that [the school] remain[s] in compliance for students according to how their IEP is written."  (Testimony of Randy Geyer, Hr'g Tr. Vol. 1 at 100:8-13.)  Mr. Geyer's testimony highlights the schools' awareness of a need to comply with terms of an IEP, as well as suggests that IEPs will be written to explicitly include less time in special education than the IEP team concludes is appropriate in order to plan for both anticipated and unanticipated disruptions to a student's every-day schedule.

However, this Court is not persuaded that the thirteen and fifteen hours provided in S.S.'s IEPs were adequate.  "In the absence of evidence available to the parents at the time of the decision not to enroll their child in the placement," "the appropriate inquiry is into the nature of the program actually offered in the written plan, not a retrospective assessment

of how that plan would have been executed." *J.C. ex rel. C.C. v. New York City Dept. of Educ.*, No. PGG-12-3759, 2015 WL 1499389 (S.D.N.Y. Mar. 31, 2015).  Across S.S.'s IEPs, the maximum time of special education services per week that was provided was only half the service hours per week that experts agreed was appropriate.  The gap between fifteen and thirty hours per week seems like more than enough of a cushion to protect a school from the disruptions in a student's programming like absences and holidays.

Further, this Court, unlike the ALJ, is persuaded by the significance of the Parents' inability to enforce S.S.'s IEP against the school board and seek legal recourse for failures to provide S.S. with full-time special education services.  Even if the Parents were aware that S.S. was typically receiving more than thirteen or fifteen hours in special education each week, by the terms of S.S.'s IEP, more than fifteen hours of service provided by John Archer would be considered gratuitous.  *See M.C. by and through M.N.*, 858 F.3d 1198.  If John Archer were to leave S.S. unattended for half the school day, the Parents would have no legal complaint against the school under S.S.'s IEP.  This is a real concern.  The testimony of Kristen Colyer and Dr. McLaughlin both suggest that on multiple occasions S.S. was seen wandering around the classroom without any instruction.  (*See* Testimony of Kristen Colyer, Hr'g Tr. Vol. 6 at 1401-02; Testimony of Annie McLaughlin, Hr'g Tr. Vol 2 at 367:1-16; Testimony of Kristen Colyer, Hearing Tr. Vol. 6 at 1386:3-1387:10.)  As Mr. Geyer's own testimony seems to suggest, the school would be protected by its compliance with the terms of IEP even if this inattention was occurring regularly.  By only providing fifteen hours of special education services, S.S.'s IEPs were not written or reasonably calculated to adequately address her recognized need for specialized instruction throughout

the day.

S.S.'s January 2018 IEP did not address all her problematic behaviors and did not lead to any progress with respect to the behaviors that it did target.  The October 2017, January 2018, and November 2018 IEPs also did not include sufficient service hours per week to adequately meet S.S.'s needs.  HCPS further erred in not increasing the amount of behavioral analysis consultation time with implementation of S.S.'s Behavioral Intervention Plan and amended IEP in February 2018.  The significance of all these errors is demonstrated in S.S.'s lack of progress in her time at John Archer.  As the Supreme Court held in *Endrew F.*, "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  137 S. Ct. at 999.  The aim of the IEP must be "to enable the child to make progress."  *Id.*  Nevertheless, the ALJ concluded that S.S. did make some progress, finding that although she achieved none of her goals, she made progress on twelve (about 38%) of her thirty-one objectives.  (Hr'g Decision at 100.)  This is patently unsupportable as a matter of law and not entitled to deference by this Court.  The Parents persuasively detail the factual errors that led to an incorrect legal finding on this matter.

First, the Parents explain that the ALJ's calculation of thirty-one objectives was incorrect.  (*See* ECF No. 33-1 at 17-18.)  S.S.'s IEP drafted in October 2017 contained eight goals and thirty-six objectives.  (*See* Hr'g Decision at 13.)  S.S.'s IEP was amended in February 2018 to include two new goals and eight new objectives related to behavior.  (*See* Student Ex. 30 at 342, 395.)  No objectives were ever removed.  S.S., therefore, had ten goals and forty-four objectives on her IEP.  Second, the finding that S.S. had made progress on

twelve objectives was based on IEP Progress Reports, which do not accurately describe S.S.'s level of achievement. The "Progress Code" on every objective states "making sufficient progress to meet goal," even when the accompanying data shows no progress, or, on some objectives, even regression. (*See* Student Ex. 30 at 380-96.) For example, one of the goals added to S.S.'s IEP in January 2018 provided that S.S. "will respond appropriately to the direction 'safe body' as evidence[d] by a decrease of 75% in the frequency of self-injurious, aggressive, and sexual self-stimulatory behaviors." (*Id.* at 394.) The report does not show that any data on aggressive or self-stimulatory behavior was recorded and shows that S.S.'s self-injurious behavior increased from an average of seventeen times per day to an average of 108 times per day. (*Id.* at 395.) Despite this noted regression, the Progress Code states "[m]aking sufficient progress to meet goal." (*Id.* at 395.) The Parents' Memorandum in Support details several instances of this sort of inconsistency, making it appear as if the computer program used by HCPS to generate Progress Reports had a default setting that labeled all objectives with "making sufficient progress to meet goal," irrespective of the data. (*See* ECF No. 33-1 at 18-19.)

Indeed, the Defendants do not attempt to defend the Progress Reports. Instead, they rely on the testimony of their witnesses, who suggested that S.S. was making progress at John Archer. (ECF No. 36-1 at 34-39.) However, as the Parents' detail, the conclusory statements made by HCPS's representatives are not supported by real data. For example, much like with the Progress Reports, the testimony of Carrie Free, the Occupational Therapist at John Archer, suggested that S.S. was making "sufficient progress" on all of her occupational theory objectives, (*see id.* at 36.), but the actual data suggests that S.S. either did

not improve or actually regressed in the five areas (*see* Student Ex. 28 at 303). Ms. Free's testimony is not supported by her own written notes of S.S.'s progress. Further, the Parents reported that S.S. was noticeably cowering from peers and adults, which had not been present before her time at John Archer. (*See* Testimony of Mr. S., Hearing Tr. Vol. 4, 811:2-25.) S.S. also reportedly threw tantrums whenever is was time to get ready for school, including fighting to avoid leaving her car to go into the school building. (*Id.*)

The Supreme Court did not specify how much progress constitutes appropriate progress in *Endrew F.*, only that it be appropriate in light of the student's circumstances. It is unclear on the record whether S.S. truly made progress on her goals and objectives. Further, evidence of increases in the occurrence of her most concerning behaviors, such as self-injury, leads this Court to conclude that any progress S.S. did make was not appropriate in light of her circumstances. While analysis of whether a school board has satisfied the requirements of the IDEA is generally "prospective," *see Schaffer*, 554 F.3d at 477 (quoting *Rowley*, 458 U.S. at 207), analysis of actual education progress remains instructive. "[C]ourts should endeavor to rely upon objective factors, such as actual educational progress, in order to avoid 'substitut[ing] [their] own notions of sound educational policy for those of the school authorities which [they] review." *M.M. ex rel. D.M.*, 303 F.3d at 533-34 (quoting *Hartmann v. Loudoun Cty. Bd. of Educ.*, 118 F.3d 996, 1000 (4th Cir. 1997). The combination of all the reasons stated above leads this Court to conclude that S.S.'s IEPs for the 2017-2018 and 2018-2019 schools years were not reasonably calculated to enable S.S. to make appropriate progress in light of her circumstances. The weight of the evidence establishes that HCPS failed to provide S.S. a FAPE during the 2017-2018 and 2018-2019 school years.

### D. Appropriateness of S.S.'s Placement at Trellis School

Parents may recover the cost of private education for their child only if a court finds both (1) the proposed IEP is inadequate in its provision of a FAPE, and (2) the private education services obtained by the parents are appropriate to meet the child's needs. *Florence,* 510 U.S. 7 at 15 (citing *Burlington,* 471 U.S. at 374). Given the ALJ's determination that HCPS did not deny S.S. a FAPE, the ALJ found "no need" to address the issue of whether Trellis School provided appropriate education services to meet S.S.'s needs. This Court has found that S.S. was denied a FAPE for both the 2017-2018 and 2018-2019 school years. Therefore, an analysis of whether Trellis School is an appropriate placement for S.S. is necessary.

This Court finds that Trellis School has provided S.S. with an appropriate education to meet her needs. First, Trellis School is a year-round program based on Applied Behavioral Analysis principles and specifically designed for children with Autism Spectrum Disorders. (Testimony of Stephanie Moore, Hearing Tr. Vol. 2 at 214:22-23.) In addition to offering year-round programming, Trellis has an on-site Board Certified Behavior Analyst, with expertise in autism and Applied Behavioral Analysis, who works full-time at Trellis and visits classes daily. (*Id.* at 259-61.) Although this Court found that Parents had not proven a twelve-month program was necessary on its own to provide a FAPE, this Court is persuaded that such a program would beneficial to S.S. This Court finds that HCPS's failure to increase behavioral analysis consultation hours was an error contributing to the denial of FAPE. The on-site analyst availability is a significant benefit for S.S. and the implementation of her programming.

Further, the data collected from S.S.'s time at Trellis School clearly demonstrates that S.S. has achieved significant progress and is flourishing at Trellis School.  Within three weeks, S.S.'s reaction to going to school had changed dramatically.  (Testimony of Mr. S., Hearing Tr. Vol. 4 at 811:3-25.)  As opposed to resisting her parents as they attempted take her into John Archer, S.S. would instead try to unbuckle her own seatbelt upon arrival at Trellis.  (*Id.*)  At John Archer, S.S. would cower from her classmates.  (Testimony of Kim Manzo, Hearing Tr. Vol. 6 at 1336:12-18.)  Once at Trellis, this behavior stopped at home and improved at school.  (Testimony of Mr. S., Vol. 4 at 811:15-25; Testimony of Stephanie Moore, Tr. Vol. 2 at 224:17-18.)  S.S. lost weight in her time at John Archer, but at Trellis, S.S. was actually able to put on sixteen pounds in one year.  (Testimony of Mr. S., Hearing Tr. Vol. 4 at 812:12-24.)  Additionally, S.S.'s heart condition improved so much in her first year at Trellis that her cardiologist reduced her number of required appointments to one check-up per year.  (*Id.*)  S.S. has stopped pulling her hair and no longer has a visible bald spot.  (Hr'g Decision at 60.)  Trellis has seen a decrease in both the frequency and intensity of S.S.'s self-injurious behaviors.  (*See* Testimony of Caitlin Sprouse, Hearing Tr. Vol. 3 at 628:8-23.)  A VB-MAPP assessment, which measures learning and language skills in students with autism, showed that S.S. had improved in areas such as labeling, listening, imitation, and play "milestones" from April 2018 to October 2018.  (Testimony of Amanda Pederson, Hearing Tr. Vol. 3 at 667.)  In that same time, S.S.'s "barriers" to learning, such as lack of instructional control and defective communication skills, significantly decreased.  (*Id.* at 668.)  Numerous witnesses reported improvements in communication skills and speech.  (*See* Student Ex. 43 at 499; Testimony of Sandra Holly, Hearing Tr. Vol. 5 at 1047:19-1049:2,

1054:8-13; Testimony of Catherine Wallace, Hearing Tr. Vol. 4 at 933:7-10.)

This is only a portion of the evidence in the record that suggests S.S. is making significant progress at Trellis. HCPS does not contest this progress. (Hearing Tr. Vol. 7 at 1528:22-24.) The Parents have clearly shown that Trellis School provides an education appropriate to the needs of their daughter.

## II.     Rehabilitation Act and Americans with Disabilities Act Claims (Counts 2 and 3)

In addition to the IDEA claims in Count 1 of their complaint, the Parents allege in Counts 2 and 3 that HCPS violated § 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), and its implementing regulations at 34 C.F.R. § 104.33(a), as well as Title II of the Americans with Disabilities Act, 42 U.S.C § 12131, *et seq.*, and its implementing regulations at 28 C.F.R. § 35. Section 504 of the Rehabilitation Act provides:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

29 U.S.C. § 794(a). The term "program or activity" includes "all the operations of . . . a local educational agency . . . or other school system." 29 U.S.C. § 794(b)(2)(B). Title II of the ADA provides, in part: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132. "To the extent possible," the Fourth Circuit "construes the ADA and the Rehabilitation Act to impose similar requirements." *See Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454 (4th Cir. 1995). "Thus, despite the

different language these statutes employ, they require a plaintiff to demonstrate the same elements to establish liability." *Id.* at 461 (internal citations omitted).  Generally, "[i]n the context of a student excluded from an educational program, to prove a violation of either [the ADA or § 504], the plaintiff must establish that (1) he has a disability, (2) he is otherwise qualified to participate in the defendant's programs, and (3) he was excluded from the program on the basis of his disability." *Id.  See also R.F. v. Cecil Cnty. Pub. Schs.*, No. ADC-17-2203, 2018 WL 3079700, at *16 (citing *Sellers ex. Rel. Sellers v. Sch. Bd. of Manassas, Va.*, 141 F.3d 524, 527 (4th Cir. 1998)).

In *Sellers*, the Fourth Circuit held that, in the specific context of a claim under § 504 that a school system has not provided a FAPE to a child with a disability, a finding of discrimination based on disability requires a showing of "bad faith or gross misjudgment" by the school system.  141 F.3d at 529.  By extension, virtually the same standard applies under Title II of the ADA.  The "'bad faith or gross misjudgment' standard is extremely difficult to meet, especially given the great deference to which local school officials educational judgments are entitled." *Doe v. Arlington Cnty. Sch. Bd.*, 41 F. Supp. 2d 599, 609 (E.D. Va. 1999).  Although what constitutes "bad faith or gross misjudgment" in this context is not well defined, this Court has previously noted that allegations of negligence, standing alone, are insufficient. *See K.D. ex rel. J.D. v. Starr*, 55 F. Supp. 3d 782, 790 (D. Md. 2014) (citing *Sellers*, 141 F.3d at 529).

In this case, S.S.'s disability is undisputed, and no dispute has been raised as to whether S.S., a public-school student, was eligible for public education in Harford County. Thus, the only dispute arises from whether S.S. either was excluded from participation in or

denied public education or was otherwise discriminated against on the basis of her disability. The ALJ did not make any fact determinations regarding claims under § 504, as the Due Process Hearing was brought under the IDEA.

The Parents allege that HCPS denied S.S. a FAPE, and that in doing so, HCPS practices and policies departed substantially from accepted professional judgment, practice, or standards, causing harm to S.S.'s health, safety, and welfare. (*See* Compl. 18, ECF No. 2.) These actions, the Parents argue, were taken in bad faith and with gross misjudgment. The Parents argue that Defendants did not take necessary steps to address S.S.'s escalating and highly impacting negative behaviors, specifically noting HCPS's failure to conduct a Functional Behavioral Assessment ("FBA") and implement a Behavioral Intervention Plan ("BIP") for the 2017-2018 school year. (*See* ECF No. 39 at 40-41.) The Parents also allege that HCPS did not take meaningful steps to keep her safe from harm while she attended their schools, pointing different incidents involving S.S. at Homestead-Wakefield and John Archer. (*See* Compl. 18-19, ECF No. 2.)

Regarding the claim that HCPS did not take necessary steps to address S.S.'s escalating and highly impacting negative behaviors, this Court finds that the Board of Education of Harford County did not act with bad faith or gross misjudgment. As the analysis of the IDEA claims above suggests, this Court is persuaded that the significant delay in conducting an FBA and implementing a BIP were violations of the IDEA which contributed to S.S.'s denial of a FAPE in the 2017-2018 school year, but this Court does not find that HCPS's mistake rises to the level of bad faith or gross misjudgment. Some courts have held that "statutory noncompliance alone does not constitute bad faith or gross

43

misjudgment," *B.M. ex rel. Miller v. S. Callaway R-11 Sch. Dist.*,  732 F.3d 882, 888 (8th Cir. 2013), and that the standard requires activity that "depart[s] substantially from accepted professional judgment, practice or standards as to demonstrate that the persons responsible actually did not base the decision on such judgment," *M.Y. ex rel. J.Y. & D.Y. v. Special Sch. Dist. No. 1*, 544 F.3d 885, 890 (8th Cir. 2008).  Although HCPS erred in delaying an FBA and adjusting S.S.'s IEP accordingly, the Parents have not put forward sufficient evidence that suggests that this was done in an intentionally discriminatory manner.

On the issue of the incident at Homestead-Wakefield, this Court does not find evidence to suggest bad faith or gross misjudgment.  The Parents' Complaint alleges that sometime in April or May of 2017, S.S. eloped from the classroom, and then from the school building.  (ECF No. 2 at 5.)  She was missing for an indeterminate length of time but was eventually found by a parent of another child in the parking lot.  (*Id.*)  Allegedly, the school staff had been dealing with another child at the time and had not noticed her absence.  (*Id.*)  While a student with severe autism eloping from the school is a serious matter, the Parents' complaint does not allege a causal relationship between any discrimination or bad faith and gross misjudgment on the part of the school district and this incident.

On the issue of the incidents at John Archer, this Court again does not find actions that amount to discrimination in order to have an actionable claim under § 504 and the ADA.  The Parents allege that when Mrs. S. visited John Archer in November 2017, she witnessed a boy in S.S.'s class attack and scratch S.S., and Mrs. S. learned from the teacher that similar incidents have occurred before.  (*Id.* at 8.)  It appeared that the boy had targeted S.S. with aggressive attempts and behaviors on previous occasions.  (*Id.*)  The Parents

reached out to John Archer's principal, asking why they had not been informed of the earlier incidents, and requesting that a written plain of action be created to address the issue.  (*Id.* at 8-9.)  The IEP team did propose a "safety plan" but refused to separate S.S. and the other student into different classrooms.  (*Id.* at 9.)  However, even with this plan in place, the boy again attacked S.S.  (*Id.*)  The school then agreed to separate the two students.  (*Id.*)  The Parents allege that the school's inappropriate response to this student-on-student harassment was discriminatory.

This Court is guided by the Supreme Court's test articulated in *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999), when addressing § 504 and ADA claims related to student-on-student harassment.  *See Schiffbauer v. Schmidt*, 95 F. Supp. 3d 846 (D. Md. 2015).  The "*Davis*-type" analysis requires analysis of five elements:

> (1) the child is an individual with a disability; (2) he or she was harassed based on the disability; (3) the harassment was sufficiently severe or pervasive that it altered the condition of his or her education and created an abusive educational environment; (4) the defendant had actual knowledge of the harassment; and (5) the defendant was deliberately indifferent to the harassment.

*Id.* at 858 (citing *Wright v. Carroll Cnty. Bd. of Educ.*, No. ELH-11-3103, 2013 WL 4525309, at *16 (D. Md. Aug. 26, 2013)). The Plaintiffs must cross a high bar in order to show deliberate indifference.  *See Long v. Murray Cnty. Sch. Dist.*, 522 Fed. Appx. 576 (11th Cir. 2013); *Est. of Lance v. Lewisville Indep. Sch. Dist.*, 743 F.3d 982 (5th Cir. 2014).  The Parents do not meet that high bar in this case.  The fact that John Archer's "safety plan" was not successful does not mean that the school acted with deliberate indifference.  As the U.S. Court of Appeals for the Fifth Circuit has held, "[i]neffective responses . . . are not necessarily clearly unreasonable."  *Lance*, 743 F.3d

at 999.

Further, John Archer's attempt to solve the problem and then subsequent decision to remove the boy from the classroom suggest that the school was actively working to remedy the issue.   In *Wright*, Judge Hollander of this Court, held that a school's conduct did not amount to deliberate indifference where "school officials did not ignore or starve off efforts by [the plaintiff] or his parents to address the disturbing situation."   2013 WL 4525309, at *18.   She further held that even if keeping the two relevant students near each other "reflected poor judgment, the failure to separate [them] [did] not amount to deliberate indifference."   *Id.*   An attack by one student on another is a very serious matter, and John Archer's response, although perhaps insufficient to stop the continued aggression against S.S. did not rise to the level of deliberate indifference.

Accordingly, as to Counts 2 and 3, the Plaintiffs' Motion for Summary Judgment (ECF No. 33) is DENIED and the Defendants' Cross Motion for Summary Judgment (ECF No. 36) is GRANTED.

## III.    Conclusion

For the reasons provided in Part I of this Opinion, the Plaintiffs' Motion for Summary Judgment (ECF No. 33) as to Count 1 is GRANTED and the Defendants' Cross Motion for Summary Judgment (ECF No. 36) as to Count 1 is DENIED. This Court concludes that S.S. was provided a FAPE for the 2016-2017 schools year but not for the 2017-2018 and 2018-2019 school years.   The ALJ's legal conclusion as to those two years is contrary to the administrative record in this case.   The ALJ did

not give sufficient weight to the procedural errors of HCPS regarding S.S.'s delayed Functional Behavior Assessment, failing to recognize how the delay affected the adequacy of her IEP in the fall of 2017. The ALJ further did not examine the behaviors left unaddressed by her Behavioral Intervention Plan; consider all the available evidence to support the conclusion that S.S. required additional BCBA consultation hours; or fully recognize the importance of providing sufficient special education hours explicitly in an IEP.

Additionally, the ALJ's findings as to whether S.S. made progress at John Archer are unsubstantiated by the record. In combination, these reasons compel this Court to conclude that S.S. was denied a FAPE for the 2017-2018 and 2018-2019 school years. This Court also finds that S.S.'s placement at Trellis School is appropriate. Accordingly, HCPS must provide reimbursement to the Parents for the cost of S.S.'s placement at the Trellis School for the 2017-2018 and 2018-2019 school years, as well as any continued costs to be analyzed on an annual basis.

For the reasons provided in Part II of this Opinion, the Plaintiffs' Motion for Summary Judgment (ECF No. 33) as to Counts 2 and 3 is DENIED and the Defendants' Cross Motion for Summary Judgment (ECF No. 36) is GRANTED. The Parents have not met their burden of proving actionable violations of § 504 of the Rehabilitation Act or the Americans with Disabilities Act.

Accordingly, Plaintiffs' Motion for Summary Judgment (ECF No. 33) is GRANTED IN PART and DENIED IN PART. Defendants' Cross Motion for Summary Judgment (ECF No. 36) is GRANTED IN PART and DENIED IN

PART.

A Separate Order follows.

Dated: October 27, 2020

_____/s/_____
Richard D. Bennett

United States District Judge